

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-9-2007

# Gallatin Fuels Inc v. Westchester Fire Ins

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-3133

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Gallatin Fuels Inc v. Westchester Fire Ins" (2007). *2007 Decisions.* Paper 601.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/601

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 06-3133 and 06-3141
_____

GALLATIN FUELS, INC.,

Appellant No. 06-3141

v.

WESTCHESTER FIRE INSURANCE COMPANY,

Appellant No. 06-3133

MON VIEW MINING CORPORATION (Intervenor in D.C.)
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 02-cv-02116)
District Judge:  Honorable Donetta W. Ambrose
_____

Argued May 17, 2007
Before:  FISHER and ROTH, *Circuit Judges*, and RAMBO,[*] *District Judge*.

(Filed: August 9, 2007)

John H. Williams, Jr. (Argued)
Eckert, Seamans, Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, PA  15219
        *Attorney for Gallatin Fuels, Inc.*

_____

[*]The Honorable Sylvia H. Rambo, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

Elizabeth C. Bailey
Stephen A. Cozen (Argued)
Richard M. Mackowsky
Cozen & O'Connor
1900 Market Street, 3rd Floor
Philadelphia, PA  19103

William M. Wycoff
Jacqueline O. Shogan
Thorp, Reed & Armstrong
301 Grant Street
One Oxford Centre, 14th Floor
Pittsburgh, PA  15219
        *Attorneys for Westchester Fire
        Insurance Company*

_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

This is a breach of contract and bad faith action based on an insurance company's behavior in failing to pay a claim for damaged mining equipment to a loss payee.  After a trial on the issues, the jury found for the loss payee and awarded compensatory and punitive damages.  The insurance company appeals, arguing that the verdict should be reversed because, among other things, the insurance policy had been canceled at the time of the loss.  The loss payee cross-appeals, citing other errors by the District Court.  For the reasons that follow, we will reverse the District Court's denial of judgment as a matter of law on the breach of contract claim and vacate the corresponding compensatory

2

damages award. We will affirm the remainder of the District Court's judgments, specifically the bad faith verdict and the corresponding punitive damages award.

As we write only for the parties, we will forgo a lengthy recitation of the factual and legal background to this case. This case arises out of a dispute between two commercial entities regarding which should pay to protect mining equipment from water damage. Joseph Tassone, the President, CEO, and majority shareholder of Gallatin Fuels, Inc. ("Gallatin"), formerly owned Mon View Mining Corp. ("Mon View"), which operated the Mathies Mine. Because Mon View was losing money, Tassone idled the mine in June 2000 and left the mining equipment underground. On August 17, 2000, Gallatin sold Mon View to John Hatch, but remained involved with the mine, acting among other things as the "sole and exclusive agent" to represent Mon View in selling coal from the mine.

As a part of the sales agreement between Mon View and Gallatin, Gallatin leased to Mon View the underground mining equipment it had left at the mine site. The lease required Mon View to obtain insurance to cover the leased equipment in case of fire, theft, and other risks. Pursuant to this agreement, Mon View obtained a Commercial Inland Marine insurance policy from Westchester Fire Insurance Co. ("Westchester"). This policy was obtained by Mon View acting through its insurance agent Ronald Massari, who in turn obtained the policy through broker Cooney, Rikard & Curtin, Inc.

3

("CRC"). CRC accepted the payments of the premiums for the policy on behalf of Westchester.

Even under its new ownership, Mon View continued to experience financial setbacks. When the mine's original insurance policy expired in October 2001, it sought to renew its policy with Westchester. Because Mon View could not afford to pay the premium in full, it entered into an Insurance Premium Finance Agreement ("Agreement") with Universal Premium Acceptance Corporation ("UPAC") on October 12, 2001. The Agreement provided that Mon View "appoints any officer or employee of [UPAC] as [its] Attorney-in-Fact with power to arrange payment for and/or cancellation of all policies listed . . . ." UPAC Insurance Premium Finance Agreement, App.74. In case of default of any payment, UPAC "may, after having given the 15 days (plus mailing) written notice mailed to [Mon View] of intent to cancel, during which fifteen-day period [Mon View] may cure default, thereafter cancel any policies mentioned . . . ." *Id.* Finally, the Agreement gave UPAC a security interest in all unearned premiums during the period subsequent to cancellation through the policy end date, which it was entitled to recover from Westchester if UPAC canceled the policy under its power of attorney. *Id.* Pursuant to the Agreement, UPAC paid the 2001-2002 premium amount to Westchester after Mon View's down payment.

In late 2001, a further drop in coal prices exacerbated Mon View's financial difficulties. With the mounting debt, Mon View was unable to pay its electricity bills, and despite Gallatin's efforts, Allegheny Power terminated all electric power to the mine

4

on April 8, 2002. As a result of the power being disconnected, all ventilation, water removal, and maintenance of the underground mine stopped, and the mine filled with water and toxic gases.

Unfortunately, as all of this was happening, Mon View had also stopped making its insurance premium payments to UPAC. Accordingly, on March 11, 2002, UPAC issued to Mon View a Notice of Intent to Cancel. After Mon View failed to respond to this notice, UPAC exercised its power of attorney and canceled the policy effective March 28, 2002. UPAC's records indicate that it mailed cancellation notices to Mon View, Westchester, and CRC on March 28, 2002. However, no notice was sent to Gallatin at that time. Upon cancellation, Westchester returned the unearned premium to UPAC.

Following the termination of power to the mine, Gallatin initiated the process of invoking the insurance coverage for its equipment that was still underground. It maintains that it was unaware that the insurance policy for its equipment had been terminated. In fact, Gallatin apparently sought confirmation from CRC to determine whether the policy insuring its property was still in effect. Gallatin claims that, both before and after April 8, 2002, it was assured by CRC that the policy was still in effect and had not been canceled. It also called Westchester directly to confirm this, but its calls were never returned.

Under the insurance policy that covered the mining equipment, Gallatin was named as the loss payee. This meant that in the event of a loss relating to covered

5

property in which both Mon View and Gallatin had an insurable interest, Westchester would "pay any claim for loss or damage to [the insured] and the Loss Payee, as interests may appear." Westchester Fire Ins. Co. Policy, App.1704. The policy also required notice to Gallatin in the event that Westchester canceled the policy. *Id.* at 1705.

Unaware that the policy had been canceled, Gallatin wrote to Mon View's agent, Ronald Massari, on April 15, 2002, confirming a telephone conversation involving its desire to file a claim under the policy for the loss of its mining equipment. On April 23, 2002, Brian Ferguson, a claims adjuster hired by Westchester from GAB Robins North America, Inc., traveled to Gallatin's offices to discuss the claim. During the meeting, Gallatin representatives began completing a Sworn Statement in Proof of Loss for the mining equipment. Ferguson acknowledged that they asked for his help in completing the form, but that "[he] gave them virtually none." When asked if he made a conscious effort to provide minimal assistance, if any, to Gallatin, Ferguson responded "I think that's very fair, yes."

On April 24, 2002, Gallatin sent the Proof of Loss Statement to Westchester. The statement indicated that the equipment was lost on April 8, 2002, due to a flood and/or roof collapse in the mine. It also requested $5 million, what it believed to be the policy limit, because the equipment was worth more than that amount.

On April 30, 2002, Ferguson, working on behalf of Westchester, rejected and returned the Proof of Loss Statement. He stated that no loss had occurred and that the

6

claimed amount was undocumented and unsupported. He also cited to a "Sue and Labor" provision in the policy, which Gallatin did not understand to be relevant in this situation.

Following this rejection, Gallatin hired a professional engineer to conduct an investigation into the conditions of the mine and how they affected Gallatin's equipment. On September 30, 2002, counsel for Gallatin sent this report to Ferguson, along with a letter explaining why Westchester was obligated under the policy to pay the claim. Ferguson forwarded these documents to Westchester. On October 25, 2002, Westchester responded with a letter from its counsel notifying Gallatin for the first time that its policy had been canceled by UPAC effective March 28, 2002, as a result of Mon View's failure to pay the premiums. Apparently, Westchester itself learned of the cancellation on May 8, 2002, when CRC sent a fax to Westchester notifying it that UPAC had canceled the policy effective March 28, 2002. According to the letter, Gallatin could maintain its rights under the policy by paying the outstanding premium of $66,356.00. However, the letter went on to indicate that Westchester was "not encouraging Gallatin Fuels to pay the outstanding premium for this Policy, as a multitude of coverage defenses are being specifically reserved by Westchester Fire," including thirteen paragraphs of reserved defenses, conditions, exclusions, and limitations by which Westchester could deny the claim even after Gallatin paid the outstanding premium. Gallatin did not pay the outstanding premium amount until the Magistrate Judge suggested during a status conference after the initiation of this suit that Gallatin pay the money into an escrow

7

account with Westchester's counsel.  However, after Gallatin sent a check for $66,356.000 to Westchester's counsel, it was rejected and returned to Gallatin.

On December 10, 2002, Gallatin filed a complaint in the United States District Court for the Western District of Pennsylvania alleging breach of contract and requesting a declaratory judgment against Westchester.  Gallatin also alleged that Westchester's actions constituted bad faith in violation of Pennsylvania law.  Both sides moved for summary judgment before the trial.  Westchester sought summary judgment based on the pre-loss cancellation and Gallatin's subsequent failure to reinstate its rights under the policy.  On March 11, 2004, Magistrate Judge Robert Mitchell issued a Report and Recommendation that was adopted by the District Court.  It declined to grant summary judgment because Westchester had failed to give proper notice to Gallatin under the policy.  It also determined that there were disputed facts regarding Gallatin's bad faith claim and whether the loss was fortuitous.

A trial was held from February 6 to 21, 2006.  On February 21, 2006, the jury returned a verdict against Westchester on the breach of contract and bad faith claims, and the District Court ruled that the loss was fortuitous as to Gallatin.  The jury awarded $1.325 million in compensatory damages, which represented a finding of $1.925 million in covered losses minus $600,000 for failure to mitigate.  It also awarded $20 million in punitive damages.  On March 28, 2006, the District Court reduced the jury's punitive damages award to $4.5 million.  Following the verdict, Westchester argued that it was entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 on,

8

among other things, the ground that Gallatin was not covered under the policy because it had been canceled before the loss. On June 2, 2006, the District Court denied this motion. This appeal and cross-appeal followed.

## II.

We exercise jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's denial of judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. *Buskirk v. Apollo Metals*, 307 F.3d 160, 165 (3d Cir. 2002). Judgment as a matter of law is proper where the record lacks the minimum quantity of evidence from which liability could reasonably be found. In making this determination, the evidence should be viewed in the light most favorable to the nonmovant, giving the nonmovant the benefit of every reasonable inference. *Id.* at 166. In addition, we exercise plenary review over questions of law, such as the interpretation of a contract. *See*, *e.g.*, *Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 765-66 (3d Cir. 1994).

## III.

### A.

Westchester's first argument on appeal is that the District Court erred by refusing to hold as a matter of law that the insurance policy had been canceled at the time of the loss. Gallatin, on the other hand, contends that the loss payable provision in the policy was a "standard loss payable clause," which created a separate contract between it and Westchester that could not be canceled without ten days notice.

The difference between a "standard loss payable clause" and an "ordinary loss payable clause" has been explained well by the United States Court of Appeals for the Fifth Circuit:

> Insurance policies regularly have one of two sorts of mortgagee payment clauses. Where the loss is paid to the loss payee named as its interest may appear this constitutes a simple or open-mortgage clause [also called an "ordinary loss payable clause"] under which the mortgagee is a mere appointee of the fund whose right of recovery is not greater than that of the mortgagor. . . . Conversely, where the loss payable clause contains language stipulating that, as to the mortgagee, the insurance shall not be invalidated by any act or neglect of the mortgagor or owner of the property, the effect of such language, referred to as the New York standard, or union mortgage clause is to create a separate and distinct contract on the mortgagee's interest and give to it an independent status. . . . Thus, under the standard clause, the mortgagee may frequently recover although the insured owner could not.

*Bus. Dev. Corp. of Ga., Inc. v. Hartford Fire Ins. Co.*, 747 F.2d 628, 630 (5th Cir. 1984) (quoting *Decatur Fed. Sav. & Loan Ass'n v. York Ins. Co.*, 250 S.E.2d 524, 526 (Ga. Ct. App. 1978)) (internal quotation marks omitted). *Accord Overholt v. Reliance Ins. Co. of Phila.*, 179 A. 554, 556 (Pa. 1935).[1]

To determine whether the loss payable clause in the policy at issue in this case was a standard clause or an ordinary clause, we must look at whether Gallatin, as the loss payee, had rights greater than Mon View, as the insured. *Bus. Dev. Corp.*, 747 F.2d at 630. In *Business Development Corp.*, for example, the court determined that the loss payable clause at issue was a standard one because it "extend[s] to [the loss payee] an

---

[1]Neither party disputes that Pennsylvania law applies in this case.

10

independent right to ten days' notice upon cancellation. This second half of the Loss

Payable Clause states that the insurance shall remain in force only for the benefit of the

lender during the ten-day notice period." *Id.* at 631.

A review of the loss payable clause in the instant case reveals that it does indeed

extend greater rights to Gallatin, as the loss payee, than it does to Mon View, as the

insured. For example, there is an independent notice provision with respect to Gallatin,

which provides that

> If we [Westchester] cancel this policy, we will give written notice to the
> Loss Payee at least:
> a. 10 days before the effective date of cancellation if we cancel for [Mon
> View's] nonpayment of premiums; or
> b. 30 days before the effective date of cancellation if we cancel for any
> other reason.

Westchester Fire Ins. Co. Policy, App.1705. The policy also provides that, even if Mon

View

> fail[s] to comply with the terms of the Coverage Part, the Loss Payee will
> still have the right to receive loss payment if the Loss Payee:
>
>> (1) Pays any premium due under this Coverage Part at our
>> request if [the insured] ha[s] failed to do so;
>> (2) Submits a signed, sworn proof of loss within 60 days after
>> receiving notice from us of your failure to do so; and
>> (3) Has notified us of any change in ownership occupancy or
>> substantial change in risk known to the Loss Payee.

*Id.* at 1704-05. Thus, because Gallatin as the loss payee has rights greater than those of

Mon View as the insured, it appears that this is a standard loss payable clause.

11

But the fact that the loss payable provision in the policy at issue is a standard one does not necessarily mean that Gallatin can recover under the policy. Although courts have uniformly held that standard loss payable provisions effectively create two distinct contracts within the insurance policy, a court must still examine the terms of those contracts to determine whether a loss payee can recover. We have repeatedly emphasized that "policy terms must be given their plain and ordinary meanings where the language used is clear and unambiguous." *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, 866 F.2d 71, 76 (3d Cir. 1989) (citing *Pa. Mfrs. Ass'n Ins. Co. v. Aetna Cas. & Sur. Co.*, 233 A.2d 548, 551 (Pa. 1967)). Thus, we must turn to the policy terms in this case to determine whether Westchester followed the proper procedure under its "separate, distinct, and independent" contract with Gallatin.

In examining the separate contract between Westchester and Gallatin, the first issue is whether Westchester was required to give notice of cancellation to Gallatin under the facts of this case. As noted above, the policy provides that "[i]f *we [Westchester]* cancel this policy, we will give written notice to the Loss Payee at least . . . 10 days before the effective date of the cancellation if *we* cancel for [Mon View's] nonpayment of premiums" or 30 days "if *we* cancel for any other reason." Westchester Fire Ins. Co. Policy, App.1705 (emphasis added).[2] Westchester argues that this provision was not

---

[2]In view of the plain language used in the policy, the District Court's reliance on 40 Pa. Cons. Stat. § 3310 is unavailing. That section provides that "[w]hen an insurance premium finance agreement contains a power of attorney enabling the insurance premium finance company to cancel any insurance contract or contracts listed in the agreement, the

triggered because it was *Mon View* – through its agent UPAC – that canceled the policy, not Westchester.

Gallatin, however, disputes this version of the facts. It contends that UPAC merely requested cancellation and it was Westchester that ultimately canceled the policy. Indeed, a representative from UPAC testified that "[y]ou have to understand, again, that we are only the premium finance company. We can only request [that] the polic[ies be] canceled and/or [ask for them to be] reinstated. We send out those notices [requests for cancellation] and then we look to the carriers to tell us what they're going to do, if [they're] going to cancel the policy or if they're going to have to give notice to the leinholder." Trial Transcript, App.1423.

Although this may be UPAC's view of what it did, that view is certainly not controlling as a matter of law. In this case, the policy provides that "[t]he first Named Insured shown on the Declarations [Mon View] may cancel this policy by writing or giving notice of cancellation." Westchester Fire Ins. Co. Policy, App.1702. Thus,

insurance contract or contracts shall not be canceled by the insurance premium finance company unless the cancellation is effectuated in accordance with this section." 40 Pa. Cons. Stat. § 3310(a). In terms of notice, the section provides that "[a]ll statutory, regulatory and contractual restrictions providing that the insurance contract may not be canceled unless notice is given to a governmental agency, mortgagee or other third party shall apply where cancellation is effected under the provisions of this section." *Id.* § 3310(d). Thus, had there been a requirement that Westchester notify Gallatin when the insured canceled the policy, section 3310 says that it would apply even though UPAC was the actual party who canceled the policy. But section 3310 only preserves notice requirements that already exist; it does not create new ones. The only notice requirement in the policy at issue in this case applies when Westchester cancels the policy, not when the insured does.

13

UPAC, which was acting as an agent for Mon View, had the authority to cancel the policy. Indeed, because UPAC had already paid the premium for the entire term of the policy, Westchester itself had no reason to cancel the policy. As UPAC's representative explained, had there been some provision in the policy whereby a certain notice period was required, or whereby only Westchester could cancel the policy, the facts might have been different. *See*, *e.g.*, *Standard Fire Ins. Co. v. United States*, 407 F.2d 1295, 1298 (5th Cir. 1969) (explaining that an insurance contract containing a standard loss payable clause could not be canceled without notice to the loss payee where Texas law provided that "[t]he interest of a mortgagee or trustee under any fire insurance contract . . . covering any property situated in th[e] State shall not be invalidated by any act or neglect of the mortgagor or owner of said described property"); *Bus. Dev. Corp.*, 747 F.2d at 630-31 (explaining that notice was due to the loss payee when the insured canceled the policy because the contract provided that "this insurance shall not be affected by . . . any act or neglect of the mortgagor or owner of the described buildings"). But that was not the case here: the policy allowed Mon View to cancel, and the notice provision only applied when Westchester canceled the policy. Thus, the insurance policy in this case was canceled on March 28, 2002, when UPAC acting for Mon View canceled it.

In sum, although Gallatin is correct that the loss payable provision in this case is a standard loss payable provision that creates a separate contract between Gallatin and Westchester, that does not mean that a court is free to invent terms for that separate contract. Rather, the terms of that separate contract between Gallatin and Westchester are

14

defined in the policy.  Under those terms, it appears that Westchester is only required to notify Gallatin when Westchester cancels the policy.  Westchester did not cancel the policy here, the insured did (through its agent UPAC).  Thus, the lack of notice to Gallatin did not prevent the policy from being terminated.[3]

Finally, Gallatin argues that even if a valid cancellation of the policy had been effected, Westchester is estopped from relying on this fact in court based on its representations.[4]  Pennsylvania courts have explained that "[t]o establish a promissory estoppel cause of action, a party must prove that: (1) the promisor made a promise that he

---

[3]Gallatin also argues that Westchester should have covered the loss under the provision in the policy that provided that even "if [Westchester] den[ies] [Mon View's] claim because of [Mon View's] acts or because [Mon View] ha[s] failed to comply with the terms of the Coverage Part, the Loss Payee will still have the right to receive loss payment if the Loss Payee . . . [p]ays any premium due under this Coverage Part at [Westchester's] request if [the insured has] failed to do so."  Westchester Fire Ins. Co. Policy, App.1704-05.  However, this is not a case where the policy remained in effect but the insured simply missed a payment or failed to comply with some provision of the policy.  This is a case where the insured canceled the policy.  If this clause could be invoked in the present situation, it would essentially allow a loss payee to recover indefinitely by simply paying the unpaid premium.  Even if this clause did apply in the present situation, the evidence is clear that Gallatin did not tender the unpaid premium amount to Westchester until after the start of this litigation.  Gallatin argues that it did not do so because it did not actually owe the amount being requested by Westchester since it only had an interest in some of the insured property.  Thus, when that equipment was destroyed, Gallatin argues that it did not owe Westchester any more money.  However, there is no basis for this argument.  The contract clause at issue does not speak of the premium in terms of the loss payee's interest, rather it is the premium that the insured owed under the policy.  *Id.* at 1704 ("Pays *any premium due under this Coverage Part* at our request if [the insured] ha[s] failed to do so." (emphasis added)).

[4]Although Gallatin refers to an estoppel theory generally, it did not bring a cause of action for promissory estoppel.

15

should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1006 (Pa. Super. Ct. 1997). According to Gallatin, CRC – the insurance broker in this case – repeatedly assured Gallatin that coverage was in place and that Gallatin's interests were secure. On March 20, 2002, Gallatin employee John Hart contacted CRC to ensure that the policy was still in place and to request a copy of the policy. Later, on April 3, 2002, Gallatin contacted Massari, Mon View's insurance broker, who assured Gallatin that the policy remained in force. Indeed, Massari testified that he did not know about the cancellation until April 8. The final instance asserted by Gallatin as a basis for estoppel occurred on April 15, when Hart again called CRC to discuss a possible claim that it had because of the power having been shut off on April 8.

As an initial matter, the March 20 and April 15 contacts in this case would not support any estoppel theory. The policy had not yet been canceled on March 20, and it does not appear that CRC promised that it would not be canceled in the future. By April 15, the power had already been shut off and the damage done. Thus, even if CRC informed Gallatin that the policy had been canceled on that date, the outcome would not have been different in this case. That is, Gallatin could not have reinstated the insurance to cover a past event. Accordingly, the only relevant contact appears to be the April 3 conversation between Massari and Gallatin. However, it is far from clear that Massari is

16

Westchester's agent, who could bind the insurance company with his assurances. Indeed, Gallatin explains that "Massari was an insurance broker for Mon View Mining Corporation and that Massari obtained the policy of insurance at issue in this case through CRC, another insurance broker." (Gallatin's Br. 46.) It is unclear why Mon View's agent could bind Westchester. As Gallatin explains, under Pennsylvania law, an insurance broker may be an agent for both the insured and the insurer depending on the circumstances. *See Benevento v. LifeUSA Holding*, 61 F. Supp. 2d 407 (E.D. Pa. 1999). A broker is deemed to represent the insurer where there is evidence of authorization, or some fact from which a fair inference of authorization might be deduced. *Id.* at 416; *Joyner v. Harleysville*, 574 A.2d 664 (Pa. Super. Ct. 1990). Gallatin, however, points to no evidence in the record from which such authorization might be deduced. That is, there is no reason why Gallatin should have relied on the word of Mon View's broker to represent Westchester. Accordingly, there is simply no basis for this Court to hold that Westchester is estopped from asserting that the policy in this case was canceled at the time of the loss.

In sum, we conclude that the District Court erred by failing to hold under Federal Rule of Civil Procedure 50 that the insurance policy had been canceled before the loss. Although Gallatin is correct that the loss payable clause in this case was a standard one, that conclusion does not absolve a court of following the terms of that clause to the extent they are unambiguous. *Intermetal Mexicana, S.A.*, 866 F.2d at 76. Here, it is plain from the language of the contract that the loss payee was not owed any notice when the insured

17

canceled the policy. That is precisely what happened in this case. Thus, when UPAC, acting for Mon View, canceled the policy and demanded the return of unused premiums on March 28, 2002, that ended Gallatin's ability to file a claim under the policy, and the District Court erred by holding otherwise.

B.

Next, Westchester argues that it is entitled to judgment as a matter of law on Gallatin's bad faith claim because the policy had been canceled, and even if it had not been canceled, its actions in handling the claim were reasonable.

Gallatin's claim for bad faith is premised on section 8371 of the Pennsylvania code, which provides that "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may . . . [a]ward punitive damages against the insurer . . . ." 42 Pa. Cons. Stat. Ann. § 8371. As we have explained, "[b]ad faith is a frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured." *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999). In addition, Pennsylvania courts have explained that in order to make out a statutory cause of action for bad faith in the denial of a claim, a plaintiff must establish "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis." *Booze v. Allstate Ins. Co.*, 750 A.2d 877, 880 (Pa. Super. Ct. 2000) (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994), *appeal denied*, 659 A.2d 560 (Pa. 1995)).

18

Under this standard, Westchester's first argument is that failure to provide coverage cannot be bad faith where there is no duty to provide coverage. Although this is surely correct, most of the actions on which Gallatin's bad faith claim rests occurred long before Westchester's October 25, 2002 letter explaining that the policy had been canceled. Thus, while it is certainly true that it is reasonable as a matter of law for an insurer to deny a claim on a certain ground where the policy precludes coverage on that ground, *see J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 358 (3d Cir. 2004), settling the issue in this case involves a closer look at the law surrounding statutory bad faith claims.

In *March v. Paradise Mutual Insurance Co.*, 646 A.2d 1254 (Pa. Super. Ct. 1994), the Pennsylvania Superior Court considered whether an insured's bad faith claim could proceed despite the fact that its underlying contract claim was barred by the statute of limitations. The court determined that it could: "While section 8371 provides relief only in actions 'arising under' an insurance policy, the statute does not indicate that success on the bad faith claim is reliant upon the success of the contract claim." *Id.* at 1256. Indeed, "[a]s 42 Pa.C.S. § 8371 was promulgated to provide additional relief to insureds and to discourage bad faith practices of insurance companies, we would be reluctant to impose any limitations of claims brought under section 8371 which do not appear in the plain language of the statute." *Id.*; *see also Nealy v. State Farm*, 717 A.2d 1028 (Pa. Super. Ct. 1997) ("In interpreting [section 8371], this [c]ourt has consistently held that claims

19

brought thereunder are distinct from the underlying contractual insurance claims from which the dispute arose.").

In *Frog, Switch & Manufacturing Co.*, however, we distinguished a situation where there was no underlying duty under the insurance policy from cases like *March*, where the statute of limitations had run. 193 F.3d at 751 n.9. In *Frog, Switch & Manufacturing Co.*, an insured sued its primary and excess insurance providers for breach of contract and bad faith for denying coverage and refusing to defend the insured against a competitor's claim that the insured misappropriated design drawings for dipper buckets and then advertised the buckets it produced using the drawings. After concluding that there was no duty to defend under the policy, the Court explained:

> Frog argues that a bad faith claim is not contingent on success on the underlying breach of contract claim, citing *Doylestown Electrical Supply Co. v. Maryland Casualty Insurance Co.*, 942 F. Supp. 1018, 1020 (E.D. Pa. 1996). But that case involved a situation in which the statute of limitations had expired on the breach of contract claim; a breach of a duty to defend was unredressable for procedural reasons, but it was still possible that a bad faith claim could succeed. Here, where there was no duty to defend, there was good cause to refuse to defend against a suit.

*Id.*

There are two distinctions between *Frog, Switch & Manufacturing Co.* and the instant case. First, the sole basis for the bad faith claim in *Frog, Switch & Manufacturing Co.* was the refusal to provide coverage. Thus, we merely held that if the insurer was correct as a matter of law in denying coverage, there is no basis for the claim. In the instant case, however, the bad faith claim is based largely on behavior beyond

20

Westchester's denial of the claim. As Gallatin argues, Westchester also misrepresented the terms of the policy, dragged its feet in the investigation of the claim, hid information from Gallatin, and continued to shift its basis for denying the claims. (Gallatin's Br. 79.) Thus, unlike in *Frog, Switch & Manufacturing Co.*, a finding that the insured did not ultimately have a duty to cover the plaintiff's claim does not per se make the insured's actions reasonable. *See* 193 F.3d at 751 n.9 ("Bad faith is a frivolous or unfounded refusal to pay, *lack of investigation into the facts, or a failure to communicate with the insured*." (emphasis added)).

A second distinction between the instant case and *Frog, Switch & Manufacturing Co.* is the fact that, in that case, the reason asserted for the denial of coverage was the reason found to be legally sound by the Court. That is, the insurers refused to cover the plaintiff because they consistently maintained that the claim was not covered under the policy, and we agreed. In the instant case, however, the insurer did not assert the cancellation of the policy until October 25, 2002 – well after Gallatin first attempted to make a claim in mid-April. As such, it would be odd to allow an insurer to assert its good faith by pointing to a defense to coverage that it did not even use for a large part of the relevant time period.

Thus, we conclude that *Frog, Switch & Manufacturing Co.* does not bar us from following Pennsylvania's rule that "[s]ection 8371 allows punitive damages awards even in the absence of other successful claims brought by the plaintiff." *See Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 235 (3d Cir. 2004). Rather, we find that this is

21

one of the exceedingly rare cases in which an insurer can be liable for bad faith even after the insured cancels the policy. Here, the bad faith allegations were not based simply on the insurer's representations that there was not a valid policy. Indeed, both parties believed that a policy existed for a large part of the relevant time period, and acted accordingly. Based on the evidence in the record, a jury could have found – and, indeed, did find – that Westchester acted in bad faith given its working assumption that the policy had not been canceled.[5] Therefore, we will affirm the bad faith verdict against Westchester.

---

[5]Westchester argues that there is not sufficient evidence to support a bad faith claim against it, and that it was therefore entitled to judgment as a matter of law. We disagree. First, although the Insurance Code requires insurers to provide assistance and instruction in completing any requirement of the company in making out a claim, 31 Pa. Code § 146.2, the record contains evidence that Gallatin requested help repeatedly in filling out its Proof of Loss Statement, but was given virtually none. In addition, Westchester's April 30, 2002 letter rejecting the Proof of Loss Statement was unhelpful to say the least, and a jury could have found that it violated Pennsylvania's Unfair Insurance Practices Act, which prohibits an insurance company from "[f]ailing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." 40 Pa. Cons. Stat. § 1171.5(a)(10)(xiv). Also, section 146.6 of the Pennsylvania Insurance Code provides that "[e]very insurer shall complete investigation of a claim within 30 days after notification of the claim, unless the investigation cannot reasonably be completed within that time. If the investigation cannot be completed within 30 days, every 45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected." 31 Pa. Code § 146.6. There is ample evidence that Westchester did not comply with this regulation, and indeed responded to none of Gallatin's communications between April 30, 2002 and October 25, 2002, when it asserted for the first time that the policy had been canceled. Although, as Westchester points out, violations of the Unfair Insurance Practices Act and the Unfair Claim Settlement Practices Regulations are not *per se* violations of the bad faith standard, they are admissible and relevant to support claims of bad faith. *See*, *e.g.*, *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1233 (Pa. Super. Ct. 1994).

22

C.

Finally, Westchester argues that the punitive damages verdict is unconstitutionally excessive and should be vacated. As an initial matter, Gallatin contends that Westchester waived any challenge to the constitutionality of the punitive damages award because, rather than filing a post-trial challenge to the punitive damages award, it filed a perfunctory brief asking for a hearing on the award, and then set forth its actual argument in reply to Gallatin's response brief.

But even if Westchester has not waived a challenge to the punitive damages, its arguments are unavailing. First, it argues that, because "punitive damages may not be based on conduct independent of the injury-causing conduct on which liability is based" (Westchester's Br. 53.), it was unconstitutional to base the punitive damages award here in part on violations of Pennsylvania's regulations governing the handling of insurance claims. This argument misses the point. The punitive damages award was not based on the claims-handling violations, but rather on the bad faith that they helped establish. Because "[b]ad faith is a frivolous or unfounded refusal to pay, *lack of investigation into the facts, or a failure to communicate with the insured*," any violation by Westchester that helped establish such conduct is not independent of the injury-causing conduct. *See Frog, Switch & Mfg. Co.*, 193 F.3d at 751 n.9 (emphasis added).

Second, Westchester argues that "[t]he reduced $4,500,000 amount remains excessive, as it is more than five times the $873,780 average of reported bad faith punitive damage verdicts assessed between 1996 and the present, excluding this case."

23

(Westchester's Br. 54.) There is no basis for this kind of analysis when considering the constitutionality of a punitive damages award. Indeed, it would make no sense to compare awards across cases that have utterly dissimilar facts. Rather, the relevant guideposts for determining whether or not a punitive damages award is unconstitutionally excessive were laid out by the Supreme Court in *BMW of North America v. Gore*, 517 U.S. 559 (1996). They are (1) "the degree of reprehensibility of the [defendant's behavior]," (2) "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award," and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 575. Westchester has not argued that the award fails based on any of these three guideposts.

However, in light of our holding above that the insurance policy had been canceled at the time of the loss, we must examine whether or not the punitive damages award can still stand. Specifically, given the absence of a compensatory damages award, we must figure out some way to evaluate the punitive damages award under *Gore*'s second guidepost, "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award." 517 U.S. at 575. Our holding in *Willow Inn, Inc. v. Public Service Mutual Insurance Co.* offers some guidance on this question. There, in considering the constitutionality of punitive damages awarded under the same Pennsylvania bad faith statute, 42 Pa. Cons. Stat. Ann. § 8371, "we conclude[d] that the attorney fees and costs awarded as part of the [section] 8371 claim [was] the proper term to compare to the punitive damages award for ratio purposes." 399 F.3d at 235. Thus,

we sustained a large punitive damages award even though only nominal damages were awarded for breach of contract.

In the instant case, although we are vacating the compensatory damages award, the District Court awarded $1,100,000 in attorneys' fees to Gallatin pursuant to section 8371.[6] Under *Willow Inn*, it appears that this award can be considered as part of the "harm or potential harm" when considering the constitutionality of the punitive damages award under that section. Accordingly, given the findings of the jury and the lack of arguments to the contrary by Westchester, we conclude that the resulting ratio of 4.09:1 is not constitutionally excessive.[7]

IV.

For the foregoing reasons, we will reverse the District Court's denial of judgment as a matter of law on the breach of contract claim and vacate the corresponding compensatory damages award. We will affirm the remainder of the District Court's judgments, specifically the bad faith verdict and corresponding punitive damages award.

---

[6]Westchester has not appealed this award.

[7]Given our holdings above, we need not address the remainder of the claims raised on appeal and cross-appeal.