PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-3088 & 10-3300
_____

BENJAMIN A. POST, ESQUIRE

Appellant (No. 10-3088)

v.

ST. PAUL TRAVELERS INSURANCE CO.

Appellant (No. 10-3300)


_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-06-cv-04587)
District Judge:  Honorable Anita B. Brody
_____

Argued January 25, 2012
_____

Before:  AMBRO, CHAGARES
and HARDIMAN, Circuit Judges

(Opinion filed: July 31, 2012)

George A. Bochetto, Esquire (Argued)
Bochetto & Lentz
1524 Locust Street
Philadelphia, PA   19102

Charles S. Fax, Esquire
Rifkin, Livingston, Levitan & Silver
7979 Old Georgetown Road
Bethesda, MD   20814

Marc J. Zucker, Esquire
Weir & Partners
1339 Chestnut Street
The Widener Building, Suite 500
Philadelphia, PA  19107-0000

Counsel for Appellant/Cross-Appellee

Robert L. Byer, Esquire (Argued)
Duane Morris
600 Grant Street, Suite 5010
Pittsburgh, PA   15219-0000

Francis J. Deasey, Esquire
Henri Marcel, Esquire
Stephen J. Parisi, Esquire
Deasey, Mahoney, Valentini & North
1601 Market Street, Suite 3400
Philadelphia, PA   19103-0000

Robert M. Palumbos, Esquire

Duane Morris
30 South 17th Street, United Plaza
Philadelphia, PA   19103-4196

Counsel for Appellee/Cross-Appellant

_____

OPINION  OF  THE  COURT

_____

AMBRO, <u>Circuit Judge</u>

Before us are an appeal and a cross-appeal arising from an action brought by attorney Benjamin Post ("Post") against his legal malpractice insurer, St. Paul Travelers Insurance Company ("Travelers"), for, among other things, insurance bad faith and breach of contract.  The District Court granted summary judgment in favor of Travelers on the bad faith claim, the order from which Post now appeals.  Travelers appeals the District Court's damage award of $921,862.38 to Post for breach of contract.

Post argues that his bad faith claim was erroneously dismissed at summary judgment, and asserts, among other things, that there was sufficient evidence to create a genuine issue of material fact that Travelers lacked a reasonable basis to deny coverage.  Travelers contends that the District Court erred by awarding damages on Post's breach of contract claim because the malpractice insurance policy contained an explicit coverage exclusion for sanctions proceedings.

For the reasons stated below, we affirm the District Court's grant of summary judgment in Travelers' favor on Post's bad faith claim, but we vacate and remand with respect to the District Court's damage award for breach of contract.

## I. Factual and Procedural Background

### A. The *Bobbett* Case

In 2003, Post and Tara Reid, both employed at the time by the law firm of Post & Schell, P.C., were retained to defend Mercy Hospital-Wilkes Barre, Mercy Healthcare Partners, and Catholic Healthcare Partners (collectively, "Mercy") in a medical malpractice action filed in the Court of Common Pleas of Luzerne County, Pennsylvania, captioned *Bobbett, et al. v. Grabowski, et al.*, Case No. 4310-C-2003.

In May 2005, Post left Post & Schell to start a new law firm with his wife—Post & Post, L.L.C. Thereafter, he continued to represent Mercy in the *Bobbett* matter, and Reid joined Post & Post as an associate.

Trial of the *Bobbett* case began in September 2005. During its first week, the plaintiffs introduced evidence suggesting that Post and Reid had engaged in misconduct during discovery. Specifically, on Friday, September 23, 2005, plaintiffs' counsel examined a risk manager, Anne Marie Zimmerman, regarding allegedly undisclosed redactions from medical policies produced by Mercy in discovery. Zimmerman testified that Post and Reid were responsible for the redactions. Plaintiffs' counsel characterized Zimmerman's testimony as "establish[ing] that [Post and Reid] covertly redacted and withheld information from documents . . . , and/or simply failed to produce requested documents without permission from this Court and/or notice to Plaintiffs' counsel." Plaintiffs' counsel then suggested to the presiding Judge, Hon. Peter Paul Olszewski, Jr., that the trial be adjourned for the day. On learning of this possible discovery misconduct, Mercy replaced Post as its counsel.

4

Fearing that the jury now believed that there had been a "cover-up" involving its lawyers, and concerned with the "substantial potential of uninsured punitive exposure," Mercy, represented by new counsel, began settlement negotiations with the plaintiffs over the weekend. The negotiations resulted in a settlement of $11 million, which represented the full extent of Mercy's medical malpractice policy limits. The settlement was presented to Judge Olszewski in court on Tuesday, September 27, 2005. It included a release among the parties, but with one significant caveat: the settlement agreement did not release Post, Reid, Post & Schell, and/or Post & Post from any liability they, or any of them, might have to Mercy for malpractice. Mercy did in fact threaten Post with a malpractice suit.

B.    The Policy

Post & Schell was insured against claims of legal malpractice by Travelers under Policy #GL09000524 (the "Policy"). The Policy had an annual premium of $226,500, and had an occurrence and aggregate limit of $10,000,000. The Policy insured the firm and "protected persons" (*i.e.*, the firm's attorneys) against "claims" and "suits" asserting malpractice. It thus insured Post for any alleged acts within the scope of coverage occurring (1) during the Policy's term and (2) while Post was employed by Post & Schell.

The Policy defines a "claim" as a "demand that seeks damages." It states that a claim is considered "to be first made or brought" (1) on the date that Travelers or any protected person "first receives written notice of such claim," or (2) when Travelers receives written notice from a protected person "of a specific wrongful act that caused the loss which resulted in such claim or suit." A "suit" is "a civil proceeding that seeks damages."

5

The Policy imposes on Travelers the "duty to defend any protected person against a claim or suit . . . even if any of the allegations of such claim or suit are groundless, false, or fraudulent." Travelers' duty to defend expressly includes the duty to pay "defense expenses incurred by, or for, the protected person for the claim or suit." "Defense expenses" are "fees, costs, and expenses that result directly from the investigation, defense, or appeal of a specific claim or suit," including "[f]ees, costs, and expenses of hired or appointed attorneys" and "[t]he cost of the proceedings involved in the suit, including court reporter's, arbitrator's and mediator's fees." The Policy excludes from its definition of "damages" any "civil or criminal fines, forfeitures, penalties, or sanctions . . . ." It does not define "sanctions."

The Policy provides in pertinent part as follows:

**What This Agreement Covers**

**Lawyers professional liability**. We'll pay amounts any protected person is legally required to pay as damages for covered loss that:

- results from the performance of, or failure to perform, legal services by or on behalf of any protected person; and

- is caused by a wrongful act committed on or after any retroactive date that applies and before the ending date of this agreement.

\* \* \* \* \*

6

***Damages*** means:

- compensatory damages imposed by law; and

- punitive or exemplary damages imposed by law if such damages are insurable under the law that applies.

But we won't consider damages to include any:

- civil or criminal fines, forfeitures, penalties, or sanctions; or

- legal fees charged or incurred by any protected person.

\* \* \* \* \*

***Defense expenses*** means the following fees, costs, and expenses that result directly from the investigation, defense, or appeal of a specific claim or suit:

- Fees, costs, and expenses of hired or appointed attorneys.

- The cost of the proceedings involved in the suit, including

7

court reporter's, arbitrator's, and mediator's fees.

- Fees for witnesses.

- Independent expert's and special investigator's fees, costs, and expenses.

\* \* \* \* \*

**Exclusions – What This Agreement Won't Cover**

**Criminal, dishonest, or fraudulent wrongful acts or knowing violation of rights or laws.** We won't cover loss that results from any criminal, dishonest, or fraudulent wrongful act or any knowing violation of rights or laws committed by:

- any protected person; or

- anyone with the consent or knowledge of any protected person.

C.    Mercy's Legal Malpractice Claim Against Post

On Sunday, September 25, 2005, James Saxton, an attorney with the law firm of Stevens & Lee, Mercy's newly retained counsel, advised Post's father, Barton Post, that Mercy intended to bring a lawsuit for legal malpractice against Post, and that the claim should be reported to Post's

8

insurance carrier. Saxton asked for the name of the insurance carrier so that he could make a report.

Michael Williams, Vice President for Risk and Insurance for Catholic Healthcare Partners, sent two letters on October 6 to Post advising him that he was terminated as Mercy's counsel and instructing him not to destroy any documents from the *Bobbett* case.

On October 12, Williams sent Post a third letter, this time asserting that the *Bobbett* settlement was forced on Mercy because the alleged "cover-up" by Post and Reid during discovery had caused Mercy "substantial . . . uninsured punitive exposure."

Williams stated the following:

> [W]hat clearly drove the settlement was the damage done during the testimony of Anne Marie Zimmerman regarding the document production issues raised during her testimony. More specifically is the fact that there was a claim in front of the jury that there was a "cover-up" that appeared to involve our lawyers. Further, under those circumstances and knowing that Ms. Zimmerman would likely invoke her Fifth Amendment right or testify under immunity, we absolutely disagree regarding your ability to rehabilitate. There were other aggravating factors that occurred involving you, your

father and other members of your firm; however, this is not the time to review them.

An unprecedented and certainly unanticipated situation arose in which Mercy employees needed to retain criminal counsel as directly related to the issue of redacted policies and procedures; policies and procedures that you admitted had been redacted, notwithstanding your position that such was not relevant. In fact, those redactions were most relevant and[,] as a result, an irreconcilable conflict developed with your firm, all of which put us at tremendous risk. In light of these dramatic developments, the physicians' insurers all tendered their policy limits and were prepared to take a joint tortfeasor's release. We determined the case had to be settled to protect not only the assets of the Trust but to eliminate the substantial potential of uninsured punitive exposure resulting from the actions of your firm.

On October 20, 2005, Williams again wrote to Post, stating:

10

> Pursuant to our internal protocols, your former clients, Catholic Healthcare Partners, Mercy Health Partners, and Mercy Hospital Wilkes-Barre are providing you with a copy of the executed Release in the above captioned matter. We ask that you note the carve-out for third-party claims.
>
> Please notify your professional liability insurer of this, and ask a representative of that Company to contact me upon receipt.

On October 27, Post & Schell notified Travelers that Mercy had retained Stevens & Lee as its counsel "to review the matter for possible professional malpractice implications." Post & Schell enclosed the aforementioned letters sent by Williams.

George Bochetto, counsel for Post, sent a letter to Travelers on November 3 to put it "on notice of a claim or potential claim" against Post. He enclosed the October 20 letter from Williams. On receipt of the letter (which was contemporaneous with its receipt of the October 27 letter from Post & Schell), Travelers opened a claims file for Post.

Michael Spinelli, a senior claims specialist in Travelers' New York office, assumed responsibility for the claim. During the month of November, Spinelli had numerous conversations and at least one email exchange with Post & Schell partner William Sutton regarding Travelers' retention of counsel to represent the firm in connection with Mercy's malpractice claim. There is no evidence that Spinelli

11

communicated with Bochetto or Post during this time, not even to acknowledge receipt of the claim. This was despite a Travelers' policy providing that

> [t]he claims professional is instructed to attempt to contact the insured within 24 hours of receiving the claim to introduce yourself to the insured, acknowledge that you have received the claim and to speak with them to find out more information so you could assist the insured in the handling of the matter.

On November 18, 2005, Saxton wrote to Bochetto to place Post on notice again of Mercy's malpractice claim. In relevant part, Saxton's letter stated:

> As a follow-up to the various letters and discussions regarding this matter, please be advised that [Mercy] is in the process of assigning counsel to pursue its claims against its former counsel in the *Bobbett* case. However, before getting too far into the litigation process, I wanted to further discuss a meeting of the stakeholders that you first proposed verbally to my partner, Jim Schwartzman, Esquire. While [Mercy] is moving forward with preparation for litigation, it remains open to a good-faith

12

meeting to discuss possible resolution prior to suit being filed.

To that end, they will need certain information from you, namely confirmation that you notified your client's insurers regarding the potential claim, the name of the insurance carriers, and the name of the claims representative, if assigned.

D.    The Sanctions Petition

On November 21, 2005, the plaintiffs in the *Bobbett* case filed a 108-page petition for sanctions against Post, Reid, Barton Post, and Post & Post. Post & Schell was not named as a respondent. In the petition, the plaintiffs claimed that Post and Reid violated the Pennsylvania Rules of Civil Procedure and the Rules of Professional Conduct in their handling of discovery by (1) failing to produce and/or producing altered versions of responsive documents, and (2) misrepresenting to the plaintiffs and the Court what documents Mercy had in its possession. They asserted also that Post and Reid had engaged in "dilatory, obdurate, vexatious, and/or bad faith conduct." The discovery misconduct allegedly occurred while Post and Reid were with Post & Schell and also while with Post & Post. The plaintiffs sought sanctions against each defendant, as well as "any other relief this court deems just and equitable . . . ."

By letter dated November 28, 2005, Bochetto advised Travelers of the sanctions petition and, pursuant to the Policy, requested that Travelers pay for Post's defense costs and indemnify Post with respect to the petition. After receiving Bochetto's letter seeking a defense to the petition for

13

sanctions, Spinelli had a "lengthy discussion" with Bochetto's partner, Jeffrey Ogren, on December 1, 2005 about the *Bobbett* case, the sanctions petition, and Mercy's malpractice claim. Post contended that Mercy made a malpractice claim that was covered by the Policy. Spinelli's view was that the sanctions petition only sought relief in the form of sanctions, which are expressly excluded under the Policy. As such, Spinelli's inclination was to deny coverage.

On December 1, Travelers retained attorney Mark Anesh, a partner with the insurance defense firm of Wilson Elser Moskowitz Edelman & Dicker, as outside counsel to advise it on its defense and coverage obligations with regard to Post. Anesh is a New York attorney not licensed to practice law in Pennsylvania. Despite the fact that Spinelli's general practice was to provide coverage counsel with "anything and everything" he had, he did not provide Anesh with any information regarding the allegations that Mercy made in October and November. Spinelli did not even advise Anesh of Mercy's letters. Rather, Spinelli sent Anesh only the petition for sanctions and other documents relating to the *Bobbett* case, and Spinelli asked Anesh only for his opinion on whether there was coverage in connection with the sanctions petition alone. Thus, in forming his opinion, Anesh was not aware that a claim for legal malpractice had been lodged beforehand by Mercy, nor was he aware that the factual allegations in the sanctions petition were identical to the factual allegations underlying Mercy's malpractice claim. Likewise, Anesh was not aware that Mercy had retained counsel to pursue its legal malpractice claim.

After Anesh reviewed the materials given to him and determined Travelers was not obligated to defend or indemnify Post with respect to the allegations against him in the petition for sanctions, he informed Bochetto by a December 8 letter that this was Travelers' conclusion. Anesh

14

also told Bochetto that Travelers had received a draft of the sanctions petition on October 31, 2005, three weeks before it had been filed. Anesh explained the declining of coverage as follows:

> The sole and complete relief sought by the petition at issue is not for Damages as they are defined in the Policy, but for sanctions. Since sanctions are not included in the definition of Damages under the Policy, no coverage, either for defense or indemnity, will be afforded for the above mentioned petition or any hearing subsequently scheduled to address the contents of the petition. Furthermore, a Claim is defined in the Policy as a "demand that seeks damages". Therefore, your request for defense and indemnity of the sanctions petition is not a Claim as defined in the Policy.

Travelers reserved its rights to deny coverage on several other bases, including the exclusion for "loss that results from any criminal, dishonest, or fraudulent wrongful act or any knowing violation of rights or laws." Nonetheless, Anesh stated that Travelers was willing to reconsider its decision if other information warranted it.

In a letter dated December 19, 2005, Bochetto, on Post's behalf, requested that Travelers reconsider its denial of coverage for the sanctions petition, arguing that Travelers erred on each basis it denied coverage. Travelers determined

15

that a change in coverage position was not warranted, and again denied that it owed any defense or coverage obligation to Post.

Post & Schell took the same coverage position as Post, notwithstanding that the sanctions petition did not even name the firm as a respondent. Post & Schell contended that Mercy's claim for malpractice against it and Post was "so intertwined" with the sanctions petition that Post & Schell's fees and costs incurred in the latter (responding to a document subpoena and a potential claim by Post for contribution in the event sanctions were imposed on him) should be paid by Travelers. Travelers responded that the Policy did not cover legal fees and costs that the firm incurred in connection with the sanctions proceedings.

### E. Mercy Joins In The Sanctions Proceedings

From the onset of the sanctions proceedings, Mercy participated in conferences with Judge Olszewski, insisted on receiving copies of all discovery produced by Post, and attended depositions relating to the sanctions petition.

On January 20, 2006, Mercy sought to question Post during his deposition. Post's counsel objected to the questioning on the basis that Mercy was not a party to the petition for sanctions. The parties could not resolve this discovery dispute on their own and turned to Judge Olszewski to resolve it. He decided to permit Mercy to participate in the sanctions proceedings on the condition that Mercy file an answer to the sanctions petition. On January 30, 2006, Bochetto wrote to Travelers to inform it of Mercy's intervention in the sanctions proceedings. Travelers did not respond.

16

Mercy filed an answer to the petition on February 8, 2006. It joined in the sanctions proceedings because it "was required to participate in the search, review and production of documents, and to produce witnesses for depositions." In addition, Mercy had an "important interest" in the plaintiffs' request for sanctions because it was "the misconduct of [Mercy's] former counsel that [was] at issue." Mercy's answer admitted that Post and Reid had engaged in discovery violations—without Mercy's participation—and that those violations had prejudiced the plaintiffs. Mercy alleged that Post had withheld information that he "knew[ ] or should have known" was discoverable, and had "produced incomplete copies of policies and/or covered up discoverable information on policies . . . ." It was in this context that Mercy claimed it joined the plaintiffs' request for sanctions. Mercy's prayer for relief "request[ed] that th[e] Court hold an evidentiary hearing and sanction [Post and Reid] for their conduct, and to enter any other relief [that] this Court deem[ed] just and equitable under the unique and serious circumstances presented before it, and award costs, attorneys' fees and expenses."

During his deposition in February 2006, Mercy Chief Executive Officer James May confirmed that Mercy was seeking money damages in the sanctions proceedings—for, among other things, the amount of the settlement and the negative publicity—on account of Post's alleged misconduct.

On February 20, 2006, Bochetto again wrote to Travelers, this time to notify it of Mercy's answer to and joinder in the sanctions petition, as well as May's deposition testimony, all of which made clear that Mercy was seeking money damages in the sanctions proceedings. Post and Reid sought a defense to Mercy's answer to the sanctions petition.

17

Spinelli and Anesh reviewed Mercy's answer and determined that, like the petition for sanctions itself, it did not trigger coverage because it did not allege a claim for "damages" as defined by the Policy. Anesh informed Bochetto of Travelers' coverage decision.

F.     The Travelers-Post Letter Agreement

Despite concluding that it owed no defense or indemnity obligation to Post, Travelers attempted to reach an accommodation with Post that would reimburse him for some portion of the defense costs related to the sanctions proceedings. Travelers did so because, while expressly reserving its rights on the issue of coverage, it recognized that (1) there was significant overlap between the sanctions proceedings and Mercy's threatened malpractice suit, and (2) what transpired during the sanctions proceedings could have an effect on the future malpractice suit with regard to which Travelers arguably would owe defense and indemnity obligations.

To that end, in the spring of 2006 Anesh had two meetings with counsel for Post, Reid, and Post & Schell to discuss Travelers' payment of some of their attorneys' fees despite its denial of coverage. Bochetto testified that, at the second meeting, Anesh agreed that Travelers would pay a "very substantial" amount of the legal fees incurred to date, an amount that Bochetto understood to be "in the range of hundreds of thousands of dollars." However, Bochetto admitted that Anesh "[n]ever promised . . . an exact dollar amount . . . [and that a] specific dollar amount was not mentioned."

On May 3, 2006, Anesh wrote to Bochetto and Gary Figore (Reid's counsel) offering to pay Post's and Reid's

attorneys' fees in connection with the sanctions proceedings as follows:

- Travelers would pay an hourly rate of $225 for partners, $175 for senior associates, and $150 for junior associates;

- Travelers would only pay for legal services provided on or after December 15, 2005;

- Travelers would only reimburse for attorney time "expended to defend potential legal malpractice claims"; and

- The $100,000 deductible would have to be exhausted prior to reimbursement.

In consideration for this payment, Post would have to waive any claim for payment of attorneys' fees and expenses in the context of the sanctions proceedings except as payable under the letter agreement.

Post agreed to the terms of the offer letter and submitted invoices to Travelers for over $400,000 in fees related to the sanctions proceedings, which amount included over $250,000 in fees incurred in the sanctions proceedings prior to Mercy filing its answer to the petition.

After reviewing the invoices, Anesh wrote to Bochetto on July 26, 2006 stating that Travelers would pay the amount of $36,220.26. Anesh explained that the reduction in fees—from the more than $400,000 in invoices submitted—resulted

19

from Travelers' implementation of the terms of the offer letter as it had interpreted them.

The next day Bochetto wrote to Anesh rejecting Travelers' offer of payment and stating that he was "genuinely offended by the contents of [the] letter" and that the suggestion that "only $35,000 (out of over $400,000 in fees and expenses) are reimbursable . . . is beyond ludicrous."

In August and September 2006, the parties to the sanctions proceedings began discussing the possibility of a mediation that would "encompass the sanctions matter and the potential legal malpractice action." In light of this development, Anesh wrote to Bochetto and Figore stating that Travelers "agree[d] to pay for fifty per cent (50%) of reasonable preparation time and attendance at the mediation." The mediation was scheduled for late November 2006.

G.    The Bobbetts Withdraw The Sanctions Petition

In the fall of 2006, Post filed a lawsuit against the Bobbetts' lawyer, Joseph Quinn, for defamation and tortious interference in order to create leverage to persuade Quinn to withdraw the sanctions petition. Post believed that, if this tactic succeeded and the Bobbetts discontinued the sanctions proceedings, Mercy would no longer be able to use the sanctions proceedings to obtain discovery against Post in aid of its malpractice claim without the burdens and costs of filing a direct action for malpractice. Post's lawsuit achieved its purpose—on March 23, 2007, the Bobbetts withdrew their sanctions petition with prejudice.

### H.     Mercy Files A *Praecipe* For Writ Of Summons Against Post

In late summer 2007, Mercy offered to mediate its malpractice claim against Post without resorting to litigation. Post agreed and demanded that Travelers assume all legal fees incurred by him in connection therewith.   Travelers responded that it had no duty to represent Post in the mediation nor to reimburse him for the legal fees incurred in connection with it.   Instead, Travelers made a "courtesy" offer of $3,000 as a "good faith gesture."   Bochetto rejected this offer, describing it as an "absurdity."   It almost goes without saying that the mediation between Mercy and Post was unsuccessful.

On November 19, 2007, Mercy filed a *praecipe* for writ of summons against Post in the Court of Common Pleas of Luzerne County, Pennsylvania.  The following February, Post filed a *praecipe* for writ of summons against Mercy in Philadelphia County.  In November 2008, final agreement was reached among all involved parties—Mercy, Post & Schell, Post, Reid, and Travelers—for discontinuance, with prejudice, of these two actions.  No money was paid to any person or entity by or on behalf of Post or Post & Schell in consideration for the mutual discontinuances.

### I.     This Lawsuit

On October 13, 2006, Post filed a complaint in the United States District Court for the Eastern District of Pennsylvania against Travelers, Liberty Surplus Insurance Company, and Lexington Insurance Company.   Liberty Surplus and Lexington (Post & Schell's excess insurers) were dismissed from the case in January 2007.

21

On February 7, 2008, Post filed an amended complaint against Travelers wherein he asserted five claims. Count I was for breach of contract based on Travelers' alleged breach of the Policy. Count II also was for breach of contract, but was based on Travelers' putative breach of an oral agreement between Bochetto and Anesh that Travelers would pay the costs incurred by Post in connection with the sanctions proceedings. Count III asserted a claim for insurance bad faith pursuant to 42 Pa. Cons. Stat. § 8371. In Count IV, Post asserted promissory estoppel, contending that Travelers promised to cover his defense costs in connection with the sanctions proceedings and that Post reasonably relied on Travelers' promise to his detriment. Finally, Count V sought a declaratory judgment that Post was entitled to coverage for defense costs he incurred in connection with the sanctions proceedings.

On June 30, 2008, Travelers moved for partial summary judgment as to Post's claims for breach of contract, insurance bad faith and declaratory judgment (Counts I, II, III, and V), asserting that its duty to defend Post was not triggered by the Bobbetts' sanctions petition or by Mercy's answer to it because these pleadings related only to sanctions, and sanctions are expressly excluded from coverage under the Policy.

On July 31, 2008, Post filed a cross-motion for partial summary judgment as to his breach of contract and declaratory judgment claims (Counts I, II, and V). He argued, among other things, that Travelers was legally required to defend and indemnify him in connection with the sanctions proceedings because (1) Mercy's malpractice claim, which predated the sanctions petition, triggered coverage, (2) the malpractice claim and the sanctions proceedings involved the same facts and were interrelated, and (3) Mercy was using

the sanctions proceedings to further its claim of legal malpractice.

On January 7, 2009, the District Court entered an Explanation And Order denying Travelers' motion for partial summary judgment and granting in part Post's cross-motion. Specifically, the Court denied Travelers' motion for summary judgment as to Counts I and V with prejudice, and denied that motion as to Counts II and III without prejudice. It granted Post's cross-motion as to Counts I and V, and denied it as to Count II without prejudice. The Court held that the Policy covered the sanctions petition, and explained in pertinent part as follows:

> First, . . . Mercy's malpractice claim triggered a duty to defend that included the sanctions petition after Mercy joined because that petition was involved in the covered claim. As long as Mercy's malpractice claim could have resulted in covered loss, [Travelers] had a duty to defend all proceedings involved in that claim.
>
> . . .
>
> Second, even if the sanctions petition were not part of Mercy's claim, the petition was not excluded by the Liability Policy after Mercy joined the petition. The sanctions exclusion in the Liability Policy does not exclude sanctions petitions brought or

23

joined by an attorney's former client. . . . The term "sanctions" was undefined in the Liability Policy. . . . Sanctions, particularly those for violations of discovery rules, are understood to be sought by the opposing party on motion, while a client's remedy for his or her attorney's errors is a malpractice suit.

. . .

The sanctions exclusion in the Liability Policy . . . under the commonly understood definition of sanctions . . . refers to sanctions motions brought by opposing counsel. This exclusion does not preclude from coverage a sanctions petition joined by a lawyer's former client, particularly one brought in anticipation of a malpractice suit based on identical allegations of wrongdoing. The attorney-client relationship between Post and Mercy indicates that the damages Mercy requested in the sanctions petition were actually malpractice damages, though Mercy termed them "sanctions." As Post's former client, the facts alleged by Mercy in the sanctions petition sound in malpractice, even though brought under a cause of action

24

for sanctions. It is the facts in the complaint that dictate whether the exclusion in the liability policy applies, not the cause of action selected by Mercy. If the sanctions petition were excluded from coverage, Mercy could choose whether to proceed with an action where Post was covered by his insurance carrier, or an action where Post was not, and potentially be awarded similar relief in either action.

A professional liability insurance carrier should not be able to avoid coverage for what is essentially a malpractice claim simply because of how an attorney's former client chooses to term the requested relief. Because the sanctions exclusion in the liability policy was unclear, it must be construed in favor of the insured. Therefore, the sanctions petition was not excluded from coverage under the liability policy after Mercy joined the sanctions petition and [Travelers] had a duty to defend Post at that time. [Travelers] breached [its] duty to defend Post under the Liability Policy and [is] therefore liable for breach of contract.

On January 23, 2009, the District Court entered an order expressly granting Travelers permission to file a renewed summary judgment motion as to bad faith. Travelers did so on February 9. It asserted that an insurer cannot be held liable for bad faith when, as here, its denial of coverage rests on a reasonable foundation and is fairly debatable; rather, an insurer can only be found to have acted in bad faith if its refusal to provide coverage was frivolous, unfounded, or based on a motive of self-interest or ill will.

On March 31, the District Court entered an Explanation And Order granting Travelers' motion for summary judgment as to Post's bad faith claim. It reasoned:

> Post, though he makes many allegations of misconduct on the part of [Travelers], cannot prove that [Travelers] did not have a reasonable basis to deny coverage . . . . [T]hough I previously held that coverage of the Sanctions Petition was required, [Travelers] had a reasonable basis to deny coverage. [It] denied coverage to Post because the Sanctions Petition requested relief in the form of sanctions, which . . . were excluded from the Liability Policy. . . . I find that [Travelers'] denial of coverage was not legally frivolous or unfounded. Post cannot maintain a claim for bad faith even if his allegations of improper conduct are true because the sanctions exclusion in the Liability Policy

26

was a reasonable basis for denying coverage.

Post filed a motion for reconsideration of this grant of summary judgment on his bad faith claim, which the Court denied.

In May 2009, Post withdrew Counts II and IV of the amended complaint. Thereafter, the District Court presided over a bench trial to determine the amount of damages to award Post on Count I. It concluded that he was entitled to reimbursement in the amount of $921,862.38, which represented the work relating directly to Mercy's potential malpractice claim beginning on October 12, 2005, and the work done relating to the sanctions petition after November 21, 2005.

Post now appeals the entry of summary judgment on his bad faith claim. Travelers cross-appeals from the damage award on the breach of contract claim.[1]

## II.    Discussion

### A.    Standard of Review

We review a grant of summary judgment *de novo*. *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). "To that end, we are required to apply the same test the [D]istrict [C]ourt should have utilized initially."

---

[1] The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship between the parties and the fact that the amount in controversy exceeds $75,000. We have appellate jurisdiction under 28 U.S.C. § 1291.

27

*Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 181 (3d Cir. 2009) (citation and internal quotation marks omitted). This test requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether such relief is warranted, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Chambers*, 587 F.3d at 181 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

"We may affirm the District Court's order granting summary judgment on any grounds supported by the record." *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (en banc). "To the extent that the District Court made conclusions of law, our review is *de novo*." *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 493 F.3d 393, 399 (3d Cir. 2007). We thus review *de novo* the District Court's interpretation of the Policy. *Alexander v. Nat'l Fire Ins. of Hartford*, 454 F.3d 214, 219 n.4 (3d Cir. 2006).

We review a district court's findings of fact following a bench trial for clear error. *Am. Soc'y for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557, 566 (3d Cir. 2007). In so doing, we "must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). In contrast, we exercise plenary review over a trial court's conclusions of law. *Kosiba v. Merck & Co.*, 384 F.3d 58, 64 (3d Cir. 2004). We similarly exercise plenary review over its "choice and interpretation of

legal precepts." *Blasband v. Rales*, 971 F.2d 1034, 1040 (3d Cir. 1992).

### B. Overview of Issues

The central issue for both Post's appeal from the dismissal of his bad faith claim, and Travelers' cross-appeal of the damage award on Post's breach of contract claim, is whether Travelers had a duty to defend Post in the sanctions proceedings. In short, Post asserts that Travelers owed such a duty and denying its defense obligations constituted bad faith; as such, he contends that the District Court erred by granting summary judgment in Travelers' favor on the bad faith claim. Conversely, Travelers argues that the Policy expressly excludes sanctions, and, thus, not only was the denial of coverage entirely reasonable and done in good faith, but the District Court erred by awarding damages to Post based on Travelers' supposed breach of the Policy.

### C. The Parties' Arguments

#### 1. Post's Appeal As To Bad Faith

On appeal, Post asserts that the District Court erred by granting Travelers' motion for summary judgment on bad faith "because Post had demonstrated that there were numerous genuine disputes of material fact which mandated the case being submitted to a jury." Post contends that he produced evidence establishing, among other things, that Travelers:

- ignored Post's multiple notifications of Mercy's legal malpractice claim;

- "loaded the dice" in seeking a

formal coverage opinion from its outside counsel, who was not a member of the Pennsylvania bar and who was unfamiliar with Pennsylvania insurance law, and worse, Travelers concealed from its outside counsel the existence of Mercy's claim;

- failed to investigate the Mercy malpractice claim;

- communicated freely with, and favored, Post & Schell at the expense of Post;

- provided legal representation to Post & Schell, but not to Post, under the very same insurance policy;

- never responded to Post's demand for coverage of the legal malpractice claim as a whole; instead, it denied coverage based on the more narrow issue of the sanctions proceeding without regard to the pending Mercy claim;

- ignored that the sanctions proceeding and the Mercy malpractice claim were inextricably intertwined, thus triggering coverage;

- made a bad faith offer to compromise Post's coverage claim in exchange for his waiving his rights under the Policy;

- violated its own policies and procedures, as well as Pennsylvania law, in its mishandling of Post's claim; and

- concealed documents (particularly, purported claims-handling manuals) during discovery in this case.

Post argues that "mistreatment by an insurer, quite apart from an unreasonable denial of coverage, can itself give rise to a claim of bad faith." As support for this proposition, he cites an unpublished decision of this Court, *Gallatin Fuels, Inc. v. Westchester Fire Insurance Co.*, wherein we stated that "a finding that the insure[r] d[oes] not ultimately have a duty to cover the plaintiff's claim does not per se make the insure[r]'s actions reasonable." 244 F. App'x 424, 435 (3d Cir. 2007) (citing *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999) ("Bad faith is a frivolous or unfounded refusal to pay, *lack of investigation into the facts, or a failure to communicate with the insured.*") (emphasis in *Gallatin Fuels*)).

Travelers disagrees with Post's interpretation of Pennsylvania law. According to Travelers, a bad faith claim must consist of the unreasonable and intentional (or reckless) denial of benefits. *See UPMC Health Sys. v. Metro Life Ins.*

31

*Co.*, 391 F.3d 497, 506 (3d Cir. 2004). Because it had a reasonable basis to deny coverage for the sanctions proceedings, Travelers asserts that it did not act in bad faith as a matter of law. Further, it disputes the "evidence" purportedly supporting the putative bad faith mishandling of Post's coverage claim, arguing, among other things, that: (1) Spinelli first communicated with Post's counsel—and had a "lengthy discussion" with him—within 10 days of receiving Bochetto's November 3, 2005 letter; (2) there is no evidence that Post & Schell received more favorable treatment than did Post, nor that Travelers favored the firm at Post's expense; (3) Travelers conducted a thorough investigation of Post's coverage claim— Spinelli reviewed the Policy, the sanctions petition, Mercy's answer thereto (once it had been filed), and two large binders containing documents from the *Bobbett* case, and he then took the additional step of retaining counsel to provide a coverage opinion—and this investigation continued well after Travelers declined to provide a defense in December 2005; and (4) three Travelers employees submitted affidavits attesting that no claims-handling manuals existed for the lawyer's professional group within Travelers (the supposedly concealed documents about which Post complains).

### 2. Travelers' Cross-Appeal As To The Contractual Damages Award

In support of its cross-appeal, Travelers asserts that it did not owe a duty to defend Post in the sanctions proceedings, explaining that its duty to defend Post is determined solely by the allegations in the sanctions petition and Mercy's answer to it, neither of which triggered the duty to defend because there was no statement of a claim for covered "damages," but rather a request for "sanctions," which are expressly excluded by the Policy.

32

In response, Post contends that a "demand for damages" was made by Mercy in October 2005, and the subsequently filed sanctions petition did not eliminate Travelers' duty to investigate and defend Mercy's malpractice claim. Instead,

> [t]he duty to cover [Mercy's malpractice claim] that arose in October 2005 was a single, unitary obligation, which encompassed the sanctions proceeding initiated on November 21, 2005, but was not defined by it. This is so because[ ] . . . the sanctions proceeding was [ ] merely a vehicle by which Mercy advanced its claim.

Post also observes that the duty to defend is broader in scope than the duty to indemnify, and that coverage provisions are to be interpreted broadly while exclusions are to be construed narrowly and against the insurer.

D.      Analysis

Because our resolution on the merits of the breach of contract issue (*i.e.*, whether Travelers owed a duty to defend Post under the Policy) affects our determination as to the issue of bad faith (*i.e.*, whether Travelers unreasonably and intentionally or recklessly denied coverage), we shall analyze Post's breach of contract claim first.

1.      Breach of Insurance Contract

a.      Legal Standard

"Insurance policies are contracts, and the rules of contract interpretation provide that the mutual intention of the parties at the time they formed the contract governs its interpretation." *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 540 (Pa. 2010). "Such intent is to be inferred from the written provisions of the contract. . . . If doubt or ambiguity exists it should be resolved in [the] insured's favor." *Id.* (internal citation omitted). "[A]ll provisions of an insurance contract must be read together and construed according to the plain meaning of the words involved, so as to avoid ambiguity while at the same time giving effect to all of its provisions." *Masters v. Celina Mut. Ins. Co.*, 224 A.2d 774, 776 (Pa. Super. Ct. 1966).

As already noted, an insurer's duty to defend is broader than its duty to indemnify. *Am. & Foreign Ins. Co.*, 2 A.3d at 540. It is a distinct obligation, separate and apart from the insurer's duty to provide coverage. *Id.* at 541. "An insurer is obligated to defend its insured if the factual allegations of the complaint on its face encompass an injury that is actually or potentially within the scope of the policy." *Id. See Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa. 1987) (describing the duty to defend as arising "whenever the complaint filed by the injured party may *potentially* come within the coverage of the policy" (emphasis in original)). "As long as the complaint 'might or might not' fall within the policy's coverage, the insurance company is obliged to defend." *Am. & Foreign Ins. Co.*, 2 A.3d at 541 (citation omitted).

Whether a pleading raises a claim against an insured that is potentially covered is a question to be answered by the insurer in the first instance upon receiving notice of the claim by the insured. *Id.* Although that question may be difficult, it is the insurer's duty to make a decision. *Id.* at 541-42. "The insurer's duty to defend exists until the claim is confined to a

recovery that the policy does not cover." *Id.* at 542. "Where a claim potentially may become one which is within the scope of the policy, the insurance company's refusal to defend at the outset of the controversy is a decision it makes at its own peril." *Id.*

The question whether a claim against an insured is potentially covered is answered "by comparing the four corners of the insurance contract to the four corners of the complaint." *Id.* at 541. "An insurer may not justifiably refuse to defend a claim against its insured unless it is clear from an examination of the allegations in the complaint and the language of the policy that the claim does not potentially come within the coverage of the policy." *Id.* In making this determination, the "factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured." *Frog, Switch & Mfg. Co.,* 193 F.3d at 746. "[T]o determine if there is coverage, we must look to the *facts* alleged in the underlying complaint, not the cause of action pled." *QBE Ins. Corp. v. M & S Landis Corp.*, 915 A.2d 1222, 1225 (Pa. Super. Ct. 2007) (emphasis in original). The manner in which the complainant frames its request for relief does not control. *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999) ("[T]he particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered. Instead it is necessary to look at the factual allegations contained in the complaint.").

"Under Pennsylvania law, when an insured tenders multiple claims to an insurer for defense, the insurer is obligated to undertake defense of the entire suit as long as at least one claim is potentially covered by the policy." *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 831 n.1 (3d Cir. 1995); *see also Am. Contract Bridge League v.*

35

*Nationwide Mut. Fire Ins. Co.*, 752 F.2d 71, 75 (3d Cir. 1985).

      b.      <u>Merits</u>

          i.      *Travelers' Duty To Defend Post Against Mercy's Claim Was Triggered At Least As Of October 12, 2005*

Under the Policy, Travelers had a duty to defend Post against any "claim" or "suit" for covered loss. Because the Policy differentiates a "claim" from a "suit," and because it defines a "claim" as simply "a demand that seeks damages," Travelers' duty to defend could be triggered by something short of, and prior to, the filing of a complaint. *See Heffernan & Co. v. Hartford Ins. Co. of Am.*, 614 A.2d 295, 298 (Pa. Super. Ct. 1992) (holding that insurer's duty to defend was triggered by answers to interrogatories because they put insurer "on notice that a claim for damage . . . will probably be made").

The Policy provides that a claim is considered "to be first made or brought" on the date that Travelers or any protected person "first receives written notice of such claim." We thus find no error in the District Court's conclusion that Mercy's malpractice claim was first made or brought on October 12, 2005, the date on which Mercy faxed to Post a letter blaming him for exposing it to the threat of uninsured punitive damages and forcing it to settle the *Bobbett* case for full policy limits in order to avoid such exposure. As such, Travelers' duty to defend Post in connection with Mercy's malpractice claim was triggered at least as of October 12, 2005.

36

While damages were not explicitly demanded in the October 12, 2005 letter, Mercy asserted its malpractice claim in no uncertain terms. After learning of Post's alleged misconduct, Mercy quickly terminated him as its counsel. Mercy told Post that it would sue him for malpractice. Indeed, in the September 25, 2005 conversation between Jim Saxton (of Stevens & Lee) and Barton Post (Post's father), wherein Saxton threatened "that he, on behalf of Mercy, was going to bring a lawsuit for malpractice against [Post]," Saxton also advised that Post should "make arrangements to report the claim to [Travelers], the insurance carrier." Mercy quickly followed up on this conversation by letter, dated October 6, 2005, wherein Mercy (1) advised Post that it had retained Stevens & Lee as outside counsel to investigate and potentially prosecute a legal malpractice claim against him, (2) directed Post to preserve relevant documents and electronic data in connection with the threatened malpractice suit, and (3) requested that Post produce all such relevant documents and electronic data to Stevens & Lee. All this laid the groundwork for the October 12 letter, wherein Mercy blamed Post for placing it "in a position that demanded settlement so as to limit [its] exposure and protect [its] charitable assets" from "the substantial potential of uninsured punitive exposure resulting from the actions of your firm."

Considering the cumulative effect of all that transpired—*i.e.*, Post's immediate termination as Mercy's counsel, the September 25, 2005 conversation between Saxton and Barton Post, and the October 6 and October 12 letters—it would be fantasy to believe as of October 12 that Mercy would not be seeking damages from Post in the threatened malpractice suit to compensate it for the excessive settlement it believed Post's misconduct forced on it. As the threatened malpractice suit certainly would have the potential to result in a covered loss under the Policy, Travelers' duty to defend Post in connection with Mercy's

37

malpractice claim was triggered at the latest "on the date that [Travelers] or [Post] first receive[d] a written notice" of Mercy's claim—October 12, 2005.

Travelers' contention that Mercy's letters did not trigger a duty to defend because they indicated only a "potential" claim underwhelms. There was nothing "potential" about Mercy's threat to sue Post for malpractice or its assertion that Post's misconduct caused it monetary loss. The definition of "claim" under the Policy does not require anything more than a "demand that seeks damages," which Mercy made via its threats and letters. Indeed, Travelers itself viewed its duty to defend as having been triggered by Mercy's letters because it opened a claims file for Post and assigned responsibility of the claim to Spinelli, who then spent considerable time reviewing numerous documents and analyzing the claim.

> ii. *The Scope Of Travelers' Duty To Defend Against The Sanctions Petition Is Limited To The Defense Costs Incurred By Post Subsequent To Mercy's Filing Of Its Answer On February 8, 2006*

We part ways with the District Court with regard to the scope of Travelers' defense obligation, as we disagree with its holding that Travelers' duty to defend Post encompassed the entirety of the sanctions proceedings (that is, from when they were begun by the Bobbetts).

Relying on the Policy's definition of "defense expenses"—which includes "[t]he cost of the proceedings involved in the suit, including court reporter's, arbitrator's,

38

and mediator's fees"—the District Court explained as follows:

> When Mercy joined the sanctions petition, the proceedings surrounding the petition became "involved" in Mercy's previously asserted malpractice claim through the potential for collateral estoppel effect. Mercy likely joined the sanctions petition, in part, to participate in developing the facts and/or law that would directly impact their malpractice suit (assuming the sanctions petition did not result in sufficient monetary compensation to eliminate Mercy's need to sue for malpractice).

We disagree for at least two reasons. First, the Court's holding is at odds with the very distinction it (and we) recognized between a "claim" and a "suit." This distinction was critical to its (and our) conclusion that Mercy had asserted a covered malpractice "claim" at least as of October 12, 2005. But the Court then puts aside this distinction by relying on "[t]he cost of the proceedings involved in the suit" Policy language to support its view that the sanctions proceedings "became 'involved' in" Mercy's malpractice claim once Mercy began participating in those proceedings. Under the Policy, however, "defense expenses" only include costs "involved in the *suit*," and neither Mercy's answer to the sanctions petition (February 8, 2006) nor its malpractice action against Post (November 19, 2007) had been filed when the Bobbetts filed their petition for sanctions against Post on November 21, 2005. Thus, while the sanctions proceedings

39

related to Mercy's ***claim***, there was as yet no ***suit*** that those sanctions proceedings could be "involved in." The District Court therefore erred by concluding, based on Mercy's participation in conference calls with Judge Olszewski and its insisting on receiving copies of all discovery produced in the sanctions proceedings, "that Mercy became sufficiently involved in the [sanctions] [p]etition to have 'joined' the proceedings from the day the [p]etition was filed, on November 21, 2005." No amount of participation by Mercy in the sanctions proceedings would be sufficient prior to the filing of a "suit"—which means under the Policy "a civil proceeding that seeks damages"—a prerequisite to Travelers' liability. As noted below, that prerequisite was satisfied on February 8, 2006, the date on which Mercy filed its answer to the sanctions petition and sought damages against Post.

Second, the District Court's conclusion goes against two canons of contract interpretation. Under the principle of *ejusdem generis*, "[i]t is widely accepted that general expressions such as 'including, but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples." *McClellan v. Health Maint. Org. of Pa.*, 686 A.2d 801, 805 (Pa. 1996). Similarly, "[t]he ancient maxim 'noscitur a sociis' summarizes the rule that the meaning of words may be indicated or controlled by those words with which they are associated. Words are known by the company they keep." *Northway Vill. No. 3, Inc. v. Northway Props., Inc.*, 244 A.2d 47, 50 (Pa. 1968). The "cost of the proceedings involved in the suit" includes "court reporter's, arbitrator's, and mediator's fees," not attorneys' fees. Attorneys' fees traditionally are distinguished from costs. *See, e.g.,* Fed. R. Civ. P. 54(d) (differentiating between "costs" and "attorney's fees"). The Policy recognizes this distinction, addressing attorneys' fees

40

in a separate bullet-point in the definition of "defense expenses."

In this context—*i.e.*, in the absence of a "suit" ("a civil proceeding that [sought] damages")—the Policy's "involved in" language cannot apply. Hence, Travelers did not owe a duty to defend Post in connection with the sanctions petition at the time the petition was filed by the Bobbetts on November 21, 2005.

However, Mercy's answer to the sanctions petition, filed on February 8, 2006 and which included a prayer for relief requesting "any other relief [that] this Court deems just and equitable under the unique and serious circumstances presented before it, and award costs, attorneys' fees and expenses," triggered coverage under the Policy. While Mercy did not explicitly request "damages" as an item of relief, the prayer in its answer did generally request "any other [just and equitable] relief" as well as "costs, attorneys' fees and expenses." It is debatable whether the general prayer for "other relief" rendered Mercy's answer a "civil proceeding that seeks damages." *Compare Meth v. Meth*, 62 A.2d 848, 849 (Pa. 1949) ("Under the prayer for general relief, a decree which accords with the equities of the cause may be shaped and rendered; the court may grant any appropriate relief that conforms to the case made by the pleadings although it is not exactly the relief which [h]as been asked for[.]"), *with Baird v. First Pa. Bank, N.A.*, 1 Pa. D. & C. 3d 665, 666, 1976 WL 491, at *1 (Pa. Ct. Com. Pl. 1976) (holding that a request for "such other equitable relief as the Court deems appropriate" is, by itself, no claim for relief at all, and requiring the plaintiff to amend the complaint). Mercy's specific request for "costs, attorneys' fees and expenses" nonetheless was sufficient to do so because attorneys' fees—both amounts paid by the client to the negligent attorney as well as expenses incurred by the client to prosecute its malpractice claim

41

against the attorney—are an item of damages in a legal malpractice claim. *See Bailey v. Tucker*, 621 A.2d 108, 115 (Pa. 1993) (holding that plaintiff in legal malpractice action could recover amounts paid to his attorney as damages); *Feld and Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick, and Cabot*, 458 A.2d 545, 554 (Pa. Super. Ct. 1983) (stating that clients could recover fees paid to their lawyer who violated professional obligations owed to clients); 3 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 21.6, at 22-26 (2009) (attorneys' fees incurred in legal malpractice action may be recoverable as consequential damages). Because Mercy requested its attorneys' fees as an item of relief in its February 8, 2006 answer to the sanctions petition, the sanctions proceeding at that time became a "civil proceeding that [sought] damages," and thus a "suit," thereby triggering coverage under the Policy.

In addition, Mercy's answer to the sanctions petition (in reality, its joining with the Bobbetts against Post, Reid, Barton Post, and Post & Post) admitted and/or alleged facts potentially giving rise to a covered malpractice claim under the Policy. Mercy admitted and/or alleged that Post was its former counsel, that he failed to exercise ordinary skill or knowledge by unethically and improperly redacting and/or withholding discoverable information, and that his failure to exercise ordinary skill and knowledge subjected him to sanctions and liability for attorneys' fees—in essence, stating the elements of a malpractice claim. *See Bailey*, 621 A.2d at 112 (explaining that, to state a claim for legal malpractice under Pennsylvania law, an aggrieved client must allege that: (1) the parties were in an attorney-client relationship; (2) the attorney failed to exercise ordinary skill or knowledge; and (3) the attorney's failure to exercise ordinary skill and knowledge was the proximate cause of damage to the client).

42

Moreover, because (1) Mercy sought damages in addition to sanctions, and (2) the facts admitted and alleged by Mercy in its answer to the sanctions petition stated a potentially covered malpractice claim, the Policy's sanctions exclusion does not shield Travelers from its duty to defend Post. *See Caplan,* 68 F.3d at 831 n.1 ("Under Pennsylvania law, when an insured tenders multiple claims to an insurer for defense, the insurer is obligated to undertake defense of the entire suit as long as at least one claim is potentially covered by the policy."). This exclusion would only excuse Travelers' duty to defend Post if the possibility of Mercy's recovery could be confined solely to sanctions. *See Am. Contract Bridge*, 752 F.2d at 75 ("the insurer is obligated to fully defend its insured until it can confine the possibility of recovery to claims outside the coverage of the policy"). Mercy's potential recovery could not be so confined.

> iii. *The Policy Does Not Cover Post v. Mercy*

We believe also the District Court should not have held that Post's suit against Mercy—filed in Philadelphia County in February 2008—was covered under the Policy on the basis that it was inextricably intertwined with Mercy's malpractice claim against Post.

Had Post asserted counterclaims in Mercy's suit against him, no doubt the expenses incurred by him to prosecute the counterclaims would have been covered by the Policy. *See TIG Ins. Co. v. Nobel Learning Cmtys.*, No. Civ. A. 01-4708, 2002 WL 1340332, at *14-15 (E.D. Pa. June 18, 2002) (holding that counterclaims that were inextricably intertwined with the defense of the initial claims were "logically encompassed" by duty to defend); *Safeguard Scientifics, Inc. v. Liberty Mut. Ins. Co.*, 766 F. Supp. 324, 333-34 (E.D. Pa. 1991) (holding that the insurer's duty to

defend extended to counterclaims raised in the same proceeding because "the pursuit of the counterclaims was inextricably intertwined with the defense . . . and was necessary to the defense of the litigation as a strategic matter").

However, Post did not simply assert counterclaims in the same proceeding; rather, he filed a separate civil action in a different venue. While Post's new action in Philadelphia County surely related to the case instituted by Mercy in Luzerne County, to hold that Post's separate action was covered by the Policy simply because it related to Mercy's suit would condone, and perhaps even encourage, the multiplicity of litigation. Such a holding also would place insurers in the difficult and unenviable situation of having to determine whether related cases are related enough—*i.e.*, "inextricably intertwined"—to trigger coverage for the insured's counterclaims. Both of these results are highly undesirable and, therefore, we cannot adopt such a rule.

As Judge Savage persuasively stated in *Amquip Corp. v. Admiral Insurance Co.*,

> [i]f courts were to consider the costs an insured incurred by instituting its own action for the purpose of bringing pressure on the other party under the guise of a litigation defense, it would encourage and endorse multiplicity of litigation. This is much different than requiring the insurer to reimburse the insured for the cost of prosecuting counterclaims raised in the same action.

44

No. Civ. A. 03-4411, 2005 WL 742457, at *7 (E.D. Pa. Mar. 31, 2005)(Savage, J.).

Rather than require insurers to decide whether they have a duty to cover an insured's expenses in a separate action based on a highly contextual and subjective inquiry into whether it is "sufficiently related to the underlying action" (the rule that the District Court applied here), *Amquip* provides a bright-line and sensible rule that an insurer has a duty to cover an insured's expenses for prosecuting counterclaims in the initial proceeding, but that insurer has no duty to cover the expenses incurred by an insured in prosecuting an entirely new and separate action (even if that action is related to the underlying case). While there certainly may be tactical reasons for an insured to file a related suit in a different venue, we believe that discouraging multiple litigation and providing clear coverage guidelines for insurers are more important considerations. The rule in *Amquip* will provide clarity to insurers and insureds, as well as conserve their legal costs and expenses (not to mention judicial resources), and thus will better serve insurance coverage litigants. Because *Amquip* provides a better rule of law, we hereby adopt it.

Accordingly, Travelers is not required to cover the expenses incurred by Post in connection with the separate action he filed against Mercy in Philadelphia County.

### c.      Conclusion Re Duty To Defend

Travelers owed Post a duty to defend against (1) Mercy's malpractice claim from October 12, 2005 onward, and (2) the sanctions petition subsequent to the filing of Mercy's answer on February 8, 2006. However, Travelers is not liable for the expenses incurred by Post in connection with the separate action he filed in Philadelphia County.

45

2.     <u>Insurance Bad Faith</u>

a.     <u>Legal Standard</u>

To recover for bad faith, "a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006). "Thus, an insurer may defeat a claim of bad faith by showing that it had a reasonable basis for its actions." *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 179 (3d Cir. 2011). "[T]he essence of a bad faith claim" is "the unreasonable and intentional (or reckless) denial of benefits." *UPMC Health Sys.*, 391 F.3d at 506.

The Superior Court of Pennsylvania has explained:

> "Bad faith" on [the] part of [an] insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting *Black's Law Dictionary* 139 (6th ed. 1990)).

"A reasonable basis is all that is required to defeat a claim of bad faith." *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004). Moreover, "mere negligence or bad judgment does not constitute bad faith; knowledge or reckless disregard of a lack of a basis for denial of coverage is necessary." *Frog, Switch & Mfg.*, 193 F.3d at 751 n.9.

While an insurer has a duty to accord the interests of its insured the same consideration it gives its own interests, "an insurer is not bound to submerge its own interest in order that the insured's interests may be made paramount, and an insurer does not act in bad faith by investigating and litigating legitimate issues of coverage." *J.C. Penney*, 393 F.3d at 368 (citation and internal quotation marks omitted).

Even questionable conduct giving the appearance of bad faith is not sufficient to establish it so long as the insurer had a reasonable basis to deny coverage. *Id.* (affirming summary judgment in insurer's favor on bad faith claim because there was a reasonable basis to deny coverage, even though insurer took inconsistent coverage positions in other situations and made false statements in its marketing materials). *See O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906-10 (Pa. Super. Ct. 1999) (explaining that, while bad faith "may also extend to the insurer's investigative practices," in the absence of evidence of a dishonest purpose or ill will, it is not bad faith for an insurer to take a stand with a reasonable basis or to "aggressively investigate and protect its interests").

Bad faith "must be proven by clear and convincing evidence and not merely insinuated." *Terletsky*, 649 A.2d at

47

688. This heightened standard requires evidence "so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *Bostick v. ITT Hartford Grp.*, 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999) (citations omitted). "Thus, the plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive evidentiary burden at trial." *J.C. Penney*, 393 F.3d at 367. "In a bad faith case, summary judgment [in favor of the insurer] is appropriate when there is no clear and convincing evidence that [its] conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Bostick*, 56 F. Supp. 2d at 587.

### b. Merits

The District Court correctly granted summary judgment in favor of Travelers on Post's insurance bad faith claim brought pursuant to 42 Pa. Cons. Stat. § 8371. The sanctions exclusion in the Policy provided Travelers a reasonable basis for declining to provide a defense to Post, and there is nothing in the record—let alone clear and convincing evidence—indicating that Travelers' purported mishandling of Post's claim was motivated by a dishonest purpose or ill will.

With his primary bad faith argument foreclosed by our (and the District Court's) conclusion that Travelers had a reasonable basis for declining coverage, Post asserts that Travelers engaged in bad faith conduct by, among other things, ignoring communications from the insured, violating its own policies and procedures, agreeing to pay for defense counsel for Post & Schell but not him, and keeping crucial information from Anesh as he made his coverage determination. This mishandling of his claim, Post contends,

48

is a basis for finding bad faith, irrespective of the final decision on the issue of coverage.

In support of his contention, Post principally relies on our non-precedential case of *Gallatin Fuels, Inc. v. Westchester Fire Insurance Co.*, which he cites for the proposition that "a finding that the insure[r] did not ultimately have a duty to cover the plaintiff's claim does not per se make the insure[r]'s actions reasonable." 244 F. App'x at 435. While that statement is no doubt true, Post's reliance on *Gallatin Fuels* is misplaced.

As explained above, while under Pennsylvania law bad faith may extend to an insurer's investigation and other conduct in handling the claim, that conduct must "import a dishonest purpose." *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa. Super. Ct. 2004) (citation and internal quotation marks omitted). Invariably, this requires that the insurer lack a reasonable basis for denying coverage, as mere negligence or aggressive protection of an insurer's interests is not bad faith. *See Frog, Switch & Mfg.*, 193 F.3d at 751 n.9 (explaining that "mere negligence or bad judgment does not constitute bad faith"); *O'Donnell*, 734 A.2d at 910 (explaining that an insurer may "aggressively investigate and protect its interests").

Indeed, *Gallatin Fuels* underscores this rule. In that case, both the insurer and the insured mistakenly believed that the insurance policy remained in full force when, in fact, the policy had been canceled. 244 F. App'x at 427-28. Before realizing that the policy had been canceled, however, the insurer denied the insured's claim without a reasonable basis. *Id.* at 428. The insurer also "misrepresented the terms of the policy, dragged its feet in the investigation of the claim, hid information from [the insured], and continued to shift its basis for denying the claims." *Id.* at 435. Based on these facts, we

49

held that "a jury could have found—and, indeed, did find—that [the insurer] acted in bad faith given its working assumption that the policy had not been canceled." *Id.* Because of the misrepresentations and dishonesty of the insurer in denying the claim without a reasonable basis for doing so (though there was a reason about which the insurer did not yet know), we cautioned that *Gallatin Fuels* was "one of the exceedingly rare cases in which an insurer can be liable for bad faith" even though there was no duty to provide coverage. *See id.*

That is not the case here, where Post assails largely benign claims-handling conduct—conduct that certainly does not "import a dishonest purpose"—simply because he disagrees with Travelers' decision to deny coverage on the plausible basis that the sanctions exclusion precluded coverage. Thus, *Gallatin Fuels* would not be helpful to Post's case even were it precedential. *See generally* 3d Cir. I.O.P. 5.7 ("The court by tradition does not cite to its not precedential opinions as authority. Such opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing.").

Post also relies on *Giangreco v. United States Life Insurance Co.*, 168 F. Supp. 2d 417 (E.D. Pa. 2001). The relevant issue there was whether an intoxication exclusion in a car insurance policy provided the insurer a reasonable basis to deny coverage. *See id.* at 422-23. On learning that the insured was intoxicated, the insurer denied coverage, a decision it stuck to despite evidence later uncovered that the insured did not cause the accident and may not have been able to avoid it even if unimpaired. *Id.* at 422-23. The District Court denied the insurer's motion for summary judgment as to the bad faith claim, reasoning that a jury could reasonably conclude "that [the insurer] denied plaintiffs' claim without conducting a reasonable investigation and without a

50

reasonable basis. It would not be unreasonable to conclude . . . that [the insurer] reflexively denied the claim upon learning that the insured was intoxicated without meaningfully pursuing issues of causation." *Id*. at 423.

Citing *Giangreco*, Post argues that Travelers reflexively denied coverage by relying on the sanctions exclusion in the Policy and "latching onto the subsequent filing of the sanctions proceedings as an excuse for disclaiming coverage of the broader malpractice claim." But the record belies this argument. Travelers did not automatically deny coverage, as evidenced by, among other things: (1) Spinelli's review of, and work performed in connection with, Post's coverage claim; (2) Travelers' retention of Anesh as outside counsel to provide a coverage opinion (even though the documents provided were not comprehensive); (3) Travelers' reconsideration of its declining coverage; (4) its continued investigation into the coverage issues; (5) the extensive and ongoing dialogue among Spinelli, Anesh, and Bochetto; and (6) Travelers' negotiations with Bochetto resulting in its compromise offer and letter agreement to cover a portion of Post's defense expenses. Further, unlike in *Giangreco* where the insurer's reasonable basis to deny coverage disappeared in light of new evidence, Travelers' reasonable basis remained. *Giangreco* is thus distinguishable.

c.    Conclusion Re Bad Faith

Travelers did not frivolously decline to provide a defense to Post; rather, after an investigation and retention of outside counsel, Travelers reasonably concluded that the sanctions exclusion in the Policy applied to Post's claim and denied coverage. Even if Travelers' claims-handling processes were not ideal, there is no evidence in the record— let alone clear and convincing evidence—to indicate that

51

Travelers' purported mishandling of Post's claim was motivated by a dishonest purpose or ill will. Because it performed what appears to be an adequate investigation, and because the sanctions exclusion in the Policy provided it a reasonable basis for denying coverage, Travelers did not engage in insurance bad faith.

\*　　\*　　\*　　\*　　\*

While we affirm the District Court's March 31, 2009 Order (Dist. Ct. ECF No. 109) granting summary judgment in Travelers' favor on Post's bad faith claim, we vacate its July 6, 2010 Order (Dist. Ct. ECF No. 193) entering judgment in Post's favor in the amount of $921,862.38 on the breach of contract claim. Under the Policy, Travelers is responsible for all costs incurred by Post in connection with Mercy's malpractice claim from October 12, 2005 forward and for all costs incurred by Post to defend the sanctions proceedings from February 8, 2006 forward.

With respect to those defense costs incurred by Post related to the malpractice claim, due to the broad scope of an insurer's duty to defend, Travelers is liable for all of Post's defense costs except for those costs that relate solely to the Bobbetts' sanctions petition. Travelers is liable for all of Post's defense costs incurred from February 8, 2006 that relate to the malpractice claim and/or the sanctions proceedings. However, Travelers is not liable for the expenses incurred by Post with respect to the separate action he filed against Mercy in Philadelphia.

We remand the case to the District Court to recalculate the amount of fees and expenses incurred by Post that are to be reimbursed by Travelers.

52

HARDIMAN, *Circuit Judge*, concurring in part and dissenting in part.

I agree with Judge Ambro's excellent opinion for the Court in all respects save one. Unlike my colleagues, I would hold that Travelers owed no duty to defend any portion of the sanctions proceeding the Bobbetts initiated against attorney Post.

As the majority notes, the Policy excluded sanctions from coverage, stating that Travelers would not "consider damages to include any: civil or criminal fines, forfeitures, penalties or sanctions." And the Bobbetts' petition bore all the hallmarks of a typical motion for disciplinary sanctions. *See, e.g.*, Black's Law Dictionary 1458 (9th ed. 2009) (defining "sanction" as "[a] penalty or coercive measure that results from failure to comply with a law, rule, or order" and listing as an example "a sanction for discovery abuse"). Thus, I concur that Mercy's informal participation in the sanctions proceedings could not impose on Travelers a duty to defend Post in those proceedings. I part ways with the majority with respect to whether Mercy's answer to the Bobbetts' petition converted the sanctions proceeding into a "suit" as defined by the Policy, that is, "a civil proceeding that seeks damages."

The majority concludes that Mercy's boilerplate prayer for relief—which requested that the court impose "sanction[s]" and "any other relief[] this Court deems just and equitable under the unique and serious circumstances presented before it, and award costs, attorneys' fees and expenses"—sought "damages" because attorneys' fees are recoverable in a suit for legal malpractice. The majority further reasons that Mercy "in essence" stated the elements of

1

a legal malpractice claim through its admissions in its answer. In support of this view, the majority cites cases involving legal malpractice lawsuits. *See Bailey*, 621 A.2d 108; *Feld & Sons*, 458 A.2d 545. While it is undoubtedly true that plaintiffs who bring such lawsuits may obtain compensatory damages that include attorneys' fees, I find no authority for the proposition that a plaintiff may pursue such relief merely by responding to a sanctions petition with averments that might, in a separate lawsuit, form the basis for a legal malpractice claim. Indeed, the District Court correctly recognized that "[s]anctions, particularly those for violations of discovery rules, are understood to be sought by the opposing party on motion, while a client's remedy for his or her attorney's errors is a malpractice suit." (App. 1221–22); *cf. Rohm & Haas Co. v. Lin*, 992 A.2d 132 (Pa. Super. Ct. 2010) ("[T]he purpose of discovery sanctions is to secure compliance with our discovery rules and court orders in order to move the case forward and protect the substantive rights of the parties, while holding those who violate such rules and orders accountable.").

The Pennsylvania Superior Court has recognized the fundamental distinction between disciplinary sanctions and compensatory damages:

> Sanctions, including monetary sanctions paid to an adversary in the form of fees or costs, address the interests of the court and not those of the individual. A litigant cannot rely on a sanction motion to seek compensation for every injury that the sanctionable conduct produces. Rather, an injured party must request tort damages to protect his personal interest in being

> free from unreasonable interference with his person and property.

*Werner v. Plater-Zyberk*, 799 A.2d 776, 784 (Pa. Super. Ct. 2002) (citations omitted). Under the majority's reasoning, Mercy could have obtained damages caused by Post's negligence without ever proving to a judge or jury the elements of legal malpractice. Such an award would be unprecedented in my experience.

Moreover, an innocent explanation for Mercy's participation in the sanctions proceeding belies the majority's inference that Mercy's true objective in that proceeding was to obtain compensation for Post's malpractice. The state court required Mercy to file a responsive pleading as the price of admission to participate in the sanctions proceeding, which implicated not only Mercy's former outside counsel, but also its own employees and corporate documents. In fact, Mercy indicated in its opposition to Post's motion to strike its answer that it intervened because it "was required to participate in the search, review and production of documents, and to produce witnesses for depositions."

For these reasons, I would hold that Travelers owed Post no duty to defend the sanctions proceeding, even after Mercy filed its answer.